IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **HUTZELL,** *et al.*, | : | |
| | : | Case No. 2:22-cv-02930 (consolidated with |
| | : | 1:22-cv-00437; 2:22-cv-03149; 2:22-cv 03174; |
| | : | 1:22-cv-00448; 1:22-cv-0444; 3:22-cv-00223; |
| | : | 3:22-cv-00233) |
| | : | |
| **Plaintiffs,** | : | **Chief Judge Algenon L. Marbley** |
| | : | **Magistrate Judge Elizabeth P. Deavers** |
| | : | |
| **v.** | : | |
| | : | |
| **POWER HOME SOLAR, LLC,** *et al.*, | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before this Court on Defendant Power Home Solar, LLC, d/b/a Pink Energy ("Pink Energy")'s Motion to Dismiss Plaintiffs' Amended Complaints and Compel Arbitration. (ECF No. 129).[1] For the reasons set forth below, this Motion is **GRANTED**, and the parties are **ORDERED** to arbitrate their claims.

**I. BACKGROUND**

This Court recently went into the details of these consolidated cases in evaluating the other Defendants' motions to dismiss and to compel arbitration, so it need not rehash the background here. (*See* ECF No. 128 at 2–8).[2] That said, while some aspects of the Plaintiffs' agreements vary, the high level summary of their claims is consistent: Plaintiffs sought injunctive and compensatory

---

[1] Per this Court's order consolidating the Power Home Solar cases, the parties were directed "to file all documents in the earliest filed case, No. 22-cv-2930." (ECF No. 50 at 1). Accordingly, ECF references are to the docket for Case No. 2:22-cv-2930, the lead case, unless otherwise noted, but this ruling applies to all consolidated cases with equal force.

[2] This Court originally consolidated nine Power Home Solar cases (*see* ECF No. 50), but only eight remain open as all claims in *Berger v. Power Home Solar*, No. 3:22-cv-00242, have been dismissed as of this Court's most recent opinion (*see* ECF No. 128).

1

relief against various parties involved in the sale and financing of a home solar panel system—including the solar company itself, some of its representatives, and the respective bank that provided the loan to fund the solar panels—alleging a fraudulent sales and loan scheme. In contracting for the solar panels, Plaintiffs signed two agreements: one for the sale of the panels ("Sales Agreements") and one for the loan to pay for the panels ("Loan Agreements"). Each of these agreements included an agreement to arbitrate ("Arbitration Clause"), which the other Defendants invoked early on in litigation and again after Plaintiffs filed their Amended Complaints. (*See* ECF No. 12, 76–84). Last fall, this Court dismissed all of Plaintiffs' claims against all Defendants except for Pink Energy. (ECF No. 128). Pink Energy subsequently invoked the Sales Agreements' Arbitration Clauses[3] (ECF No. 129), which brings us to today's dispute.

## II. LEGAL STANDARDS

Evaluating whether to grant a motion to compel arbitration requires four distinct determinations:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005).

When examining these considerations, "courts treat the facts as they would in ruling on a summary judgment motion, construing all facts and reasonable inferences that can be drawn therefrom in a light most favorable to the non-moving party." *Jones v. U-HAUL Co. of Mass. & Ohio, Inc.*, 16 F. Supp. 3d 922, 930 (S.D. Ohio 2014). The court is instructed, though, to examine

---

[3] The Annon plaintiffs' Sales Agreement and its included Arbitration Clause vary from the rest of the Power Home Solar plaintiffs' Sales Agreement and that Arbitration Clause, so this Court refers to these Agreements collectively as "Sales Agreements" and "Arbitration Clauses," distinguishing between them where necessary.

2

the language of the contract "in light of the strong federal policy in favor of arbitration." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citing *Mitsbuishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). Accordingly, as to the text of the agreement, "any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id.*

### III. LAW & ANALYSIS

#### A. Arbitration versus Judicial Review

##### 1. Legal Standards

This case is, at its core, a dispute over the validity of various contracts and their subparts. There are two types of contract-validity challenges relevant to today's portion of this contract dispute: "One type challenges specifically the validity of the agreement to arbitrate," and one type "challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). Because an arbitration provision is "severable" from the rest of the contract, *id.*, the former of these challenges is a question for the court while the latter of these is a question for the arbitrator, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04 (1967). If a plaintiff "affirmatively pleads" that both the broader agreement and the included arbitration agreement were procured through fraud, "the court should determine whether the arbitration clause was used to further the fraudulent scheme." *C.B.S. Emps. Fed. Credit Union v. Donaldson, Lufkin, and Jenrette Sec. Corp.*, 912 F.2d 1563, 1568 (1990). In "adjudicat[ing] the validity of the arbitration clause[,] … the court's decision will determine who—the court or the arbitrator—decides the attack on the [broader] agreement." *Id.* And in determining who should

3

decide a challenge, a court should only order a contractual validity question to arbitration if it is certain that, based on the parties' arguments, "neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–300 (2010).

As indicated by the Court's dicta in *Granite Rock*, in the same way that the parties' arguments matter, so, too, does the language in the relevant contractual provisions. Indeed, the contract language is a more threshold issue. The Supreme Court has explained that "the question [of] 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter" because "the parties [can] agree to submit the arbitrability question itself to arbitration" in the same way as "any other matter that parties have agreed to arbitrate." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986). Such an agreement within an agreement has been referred to as a "delegation provision," in which the parties can agree to arbitrate "'gateway' questions of 'arbitrability.'" *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *see, e.g.*, *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 354 (2022). In this way, the presence of a delegation provision can alter the typical allocation of arbitration-related questions by textually committing a dispute to an arbitrator that would otherwise go to the court. *Granite Rock Co.*, 561 U.S. at 299.

The parties' decision to do so, though, is subject to a "more rigorous standard" than general questions of arbitration contract formation: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S. at 944 (cleaned up); *see also AT&T Techs.*, 475 U.S. 649. This is in line with the axiomatic principle that "arbitrators derive their authority to resolve disputes only because the

4

parties have agreed in advance to submit such grievances to arbitration," such that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648–49 (first quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); then citing *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374 (1974)). In the context of arbitrating arbitrability, "clear and unmistakable evidence … might include … an express agreement to do so. In any event, whether such evidence exists is a matter for the court to decide." *Rent-A-Center*, 561 U.S. at 79–80 (Stevens, J., dissenting) (citing *First Options*, 514 U.S. at 946).

### 2. Analysis

Based on the above, this Court first asks whether the questions at issue are to be arbitrated or decided by this Court. To answer, this Court turns to the language of the Sales Agreements' Arbitration Clauses, with an eye toward the threshold impact of a potential delegation provision. The Annon Sales Agreement Arbitration Clause, which predates the rest of the Plaintiffs' agreements, provides that "the parties agree that any dispute arising out of or relating to the negotiation, award, construction, performance or non-performance, of any aspect of this agreement, shall be settled by binding arbitration[.]" (No. 22-cv-2930, ECF No. 129, Ex. A). The rest of the Plaintiffs' Sales Agreement Arbitration Clause (Farag, Heinland-Thornton, Hutzell, Shultz, Steffen-Robb, Ward, and Whitaker) includes an agreement that "the undersigned parties … acknowledge, covenant and agree that any claim, dispute, or other matter in question arising out of or related to the agreement, the project, and/or the system … shall be subject to binding bilateral arbitration[.]" (No. 22-cv-2930, ECF No. 129, Ex. B).

The plain text of these provisions reveals no "clear and unmistakable evidence" that the parties intended to arbitrate questions of arbitrability. *First Options*, 514 U.S. at 944. As discussed,

5

this evidence can be an "express agreement," as is the case in the Loan Agreement between these same parties that this Court analyzed previously. (*See* ECF No. 128 at 19–21). In that Agreement, the parties agreed that:

> All claims and disputes arising out of or relating to this [Loan] Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis. *The arbitrator shall also decide* any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, *"arbitrability" issues*).

(ECF No. 59-3 at 7 (emphasis added)).

Understandably, this Court found such language to be a "clear and unmistakable" agreement between the parties to arbitrate arbitrability issues arising out of the Loan Agreement. (*See* ECF No. 128 at 19–21 (discussing the Loan Agreements' delegation provision)). Indeed, this Court concluded that the language alone "disproved" Plaintiffs' contention that there was no such agreement to arbitrate these threshold issues. (*Id.* at 19). This Court also rejected Plaintiffs' argument that the delegation provision is "void as a matter of law": Because "Plaintiffs challenge the delegation provision … on the same bases that they dispute the enforceability of the overall Loan Agreement, … Plaintiffs' challenge is not specific to the delegation provision," and so "the question of whether the arbitration agreement is enforceable is for an arbitrator to decide." (*Id.* at 20 (citing *Becker*, 39 F.4th at 354–56).

Pink Energy asserts that all Sales Agreements "unambiguously agreed that any issues concerning the making or validity of the arbitration provision would be decided by the arbitrator." (*See* ECF No. 131 at 2–3). As such, Pink Energy asks this Court to also send the question of Sales Agreement arbitrability to arbitration on delegation provision challenge-specificity grounds, arguing that the Plaintiffs made no—and not just an unspecific—challenge to the delegation clauses. (*Id.*). But Pink Energy stretches the language of the Sales Agreements' Arbitration Clauses

6

too far. Contrary to its assertion that the Plaintiffs "unambiguously" agreed to arbitrate threshold issues, this Court finds there to be no such agreement.

To start, the language here is a far cry from a "clear and unmistakable" delegation provision. For example, in *Rent-A-Center*, the Supreme Court analyzed a delegation of arbitrability in terms more akin to the Loan Agreements. 561 U.S. 63. There, the Supreme Court found as valid the parties' agreement that "[t]he Arbitrator, *and not any federal, state, or local court or agency*, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." 561 U.S. at 66, 72–76 (emphasis added). The alleged delegation provision here has no such clarity. While this Court can follow Pink Energy's argument as to how the Arbitration Clause *could* be read as delegating threshold arbitration issues to an arbitrator, it simply is not "clear and unmistakable" that the Plaintiffs agreed to do so.

This conclusion is supported by Plaintiffs' lack of challenge to the Sales Agreements' (non-existent) arbitration delegation provision. Plaintiffs challenged the Loan Agreements' delegation provision because, as discussed above, the Loan Agreements had such a provision. (*See* ECF No. 59 at ¶¶ 147–49; *see* ECF No. 128 at 19–21). But Plaintiffs rightfully did not mount a delegation provision challenge to the language of the *Sales Agreements'* Arbitration Clauses, because there is no such delegation provision to challenge. As such, Pink Energy's argument that "the question of whether the Arbitration Provisions are enforceable is for an arbitrator to decide" fails. (ECF No. 131 at 3 (citing *Becker*, 39 F.4th at 356)).

And *Becker* is no barrier to this conclusion, as this Court's view is that the *Becker* court does not appear to have evaluated the fundamental question of whether the language at issue was actually a delegation provision. *See* 39 F.4th 351. In lieu of determining whether the parties'

7

agreement that "any 'dispute[,] controversy or claim arising out of [or] related to in any way' to this employment relationship would be arbitrated" was a "clear and unmistakable" delegation, that court seems to have assumed for the purposes of its analysis that the arbitration agreement included such a provision. *Id.* at 354. Based on this assumption, the court concluded that the plaintiff's challenge to the alleged delegation provision was "not specific enough to enforce judicial review," and focused instead on "[w]hether a non-signatory can enforce a delegation clause[.]" *Id.* at 355–56.

Given the above evidence to the contrary, and that this Court finds Plaintiffs' "claim that the arbitration agreement is unconscionable undermines any suggestion that [they] 'clearly' and 'unmistakably' assented to submit questions of arbitrability to the arbitrator," this Court is empowered to adjudicate the threshold arbitrability issue. *Rent-A-Center*, 561 U.S. at 82.

So, this Court then turns to identify what exactly Plaintiffs are challenging. Plaintiffs' complaints make clear that they take issue with both the Sales Agreements as a whole and the Arbitration Clauses therein. Plaintiffs state two distinct causes of actions regarding the allegedly fraudulent manner in which Defendants presented the Sales Agreements and all of its terms: one for fraud in the inducement/execution of the Sales Agreement and one to void the "undisclosed" arbitration and limitation of liability clauses. (ECF No. 59 at 18–21). As to the arbitration clause specifically, Plaintiffs allege "there was no meeting of the minds" and that the Arbitration Clauses are therefore "void as a matter of law." (*Id.* at 21). As the formation and enforceability of the Arbitration Clauses is squarely "in issue" for reasons explicitly tied to that clause—as opposed to the contract as a whole—it is up to this Court to determine whether such a clause should take effect, *Granite Rock Co.*, 561 U.S. at 299, which then informs how Plaintiffs' equally clear challenge to the Sales Agreements is to be handled, *C.B.S. Emps.*, 912 F.2d at 1568.

8

### B. Enforceability of the Arbitration Clause

In moving to compel arbitration, Pink Energy argued that the agreement to do so is enforceable as it is neither procedurally nor substantively unconscionable under Ohio state law. *Hutzell*, ECF No. 129 at 14–18). Plaintiffs disagree, pointing to the auto-filling of their signatures, lack of awareness of the Arbitration Clauses, and the disparate impact on them of arbitrating under Construction Rules rather than Consumer Arbitration Rules. (ECF No. 130 at 6–7, 10–16). This Court takes these arguments in turn before evaluating whether Plaintiffs claims are subject to this Arbitration Clause, if enforceable.

#### 1. Legal Standards

As a threshold matter, the law is clear that: (1) "arbitration cannot be forced upon parties who do not consent to it"; and (2) a party "cannot be excused from complying with the arbitration provision if it simply failed to properly read the contract." *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1015–16 (6th Cir. 2003). Combined, "these two points establish the general rule that 'one who signs a contract which he has had an opportunity to read and understand, is bound by its provisions.'" *Id.* (cleaned up) (quoting *Stout*, 228 F.3d at 715).

As "arbitration agreements are fundamentally contracts, [federal courts] review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007). Under Ohio law, an arbitration clause is unenforceable if a court finds it to be unconscionable. *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St. 3d 352, 2008-Ohio-938, 884 N.E.2d 12 (2008). Unconscionability encompasses two separate concepts: (1) individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible, i.e., "procedural unconscionability"; and (2) unfair and unreasonable contract terms, i.e.,

"substantive unconscionability." *Eastham v. Chesapeak Appalachia, L.L.C.*, 754 F.3d 356, 365 (6th Cir. 2014) (internal quotation marks omitted) (citing *Collins v. Click Camera & Video, Inc.*, 86 Ohio App. 3d 826, 621 N.E.2d 1294, 1299 (1993)). To demonstrate that an arbitration clause is unenforceable, the party asserting unconscionability must prove that the clause is both substantively and procedurally unconscionable under Ohio precedent. *Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 908 N.E.2d 408 (2009).

When evaluating procedural unconscionability, the key question is whether "each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or [if] the important terms [were] hidden in a maze of fine print[.]" *Ohio Univ. Bd. of Trs. v. Smith,* 132 Ohio App. 3d 211, 724 N.E.2d 1155, 1161 (1999) (citing *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376, 383, 613 N.E.2d 183, 189 (1993)). To answer this question, Ohio courts look to "factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible." *Cross v. Carnes*, 132 Ohio App. 3d 157, 724 N.E.2d 828, 837 (1998). But the Ohio Supreme Court has found that "the law does not require that each aspect of a contract be explained orally to a party prior to signing." *ABM Farms, Inc. v. Woods*, 81 Ohio St. 3d 498, 692 N.E.2d 574, 578 (Ohio 1998). And, relevant here, "[a] person who signs a contract without making a reasonable effort to know its contents cannot, in the absence of fraud or mutual mistake, avoid the effect of the contract." *Pippin v. M.A. Hauser Enters., Inc.*, 111 Ohio App. 3d 557, 676 N.E.2d 932, 937 (1996).

*2. Analysis*

In arguing that Pink Energy's dual-agent salesperson-loan representative model was procedurally fraudulent, Plaintiffs highlight the auto-generated nature of the 34-page legal document that was presented for signature after less than one minute of explanation, during which the salesperson emphasized the need to "act[] fast." (ECF No. 130 at 12). Plaintiffs claim that they were never informed of an agreement to arbitrate, nor did they sign the page containing this agreement, as they "input their signature and initials once in the DocuSign system" which was then copied and pasted into the remaining signature lines. (*Id.*). They explain that they had no ability to review the contract independently, let alone review it with a lawyer or negotiate the terms of the agreement. (*Id.* at 12–13). In support of these arguments, they point to the Stark County court's finding of procedural unconscionability in these exact circumstances. (*Id.* at 13 (citing *Cleveland v. Power Home Solar, LLC.*, Stark County, Ohio Case No. 23-CV-00730, July 31, 2023, and November 8, 2023 Orders)).

But in Pink Energy's view, Plaintiffs never allege "any specific misrepresentation" as to the agreement to arbitrate, as is required under Sixth Circuit and Supreme Court precedent. (ECF No. 129 at 16). Without this, because Plaintiffs did not ask for more time to read and understand the Arbitration Clause and because Plaintiffs signed the Sales Agreement, Pink Energy asserts that the Arbitration Clause is procedurally sound. (*Id.* at 17).

Here, Plaintiffs make no allegations of an issue regarding general education and intelligence, though they highlight their lack of knowledge of solar panel systems. (ECF No. 130 at 12). There is also no indication that Plaintiffs were unable, because of time or mental capability, to read and comprehend the agreement, even if that required asking for more time. *See Hurst v. Enter. Title Agency, Inc.*, 2004-Ohio-2307, 157 Ohio App. 3d 133, 809 N.E.2d 689 (11th Dist.).

11

While this Court appreciates Plaintiffs' assertion that they felt they had no ability to alter the terms of the contract, they "failed to inquire or engage [the salesperson] in any conversation, let alone negotiations, regarding the terms of the agreement." *Id.* Indeed, "many modern insurance policies are contracts of adhesion," which " have two notable characteristics: disparate levels of sophistication between the parties and a one-sided 'take it or leave it' form that does not allow for even-handed bargaining." *Old Republic Ins. v. Underwriters Safety*, 306 F. App'x 250, 254 (6th Cir. 2009).

While it is uncertain whether Plaintiffs could have made alterations to the Sales Agreements had they wished to do so, "by itself, the inability to alter a contract's terms is insufficient to establish procedural unconscionability." *Metro. Prop. & Cas. Ins. Co. v. Pest Dr. Sys., Inc.*, No. 3:14-cv-143, 2015 WL 4945767, at *9 (S.D. Ohio Aug. 20, 2015) (citing *Collins*, 86 Ohio App. 3d at 835, 621 N.E.2d at 1300). What is more, "Ohio courts have declined to find so-called 'adhesion contracts' procedurally unconscionable where alternative sources exist for nonessential goods or services." *Id.* (collecting cases). As Plaintiffs were free to decline Pink Energy's terms and find an alternative solar panel service, their inability to alter the Sales Agreement Arbitration Clauses does not make them procedurally unconscionable. Additionally, the Arbitration Clause was not hidden and is the same size as the rest of the contract. *See Ball v. Ohio State Home Servs., Inc.*, 2006-Ohio-4464, ¶ 9, 168 Ohio App. 3d 622, 861 N.E.2d 553 (9th Dist.).

True, the salesperson went through the contract extremely quickly and did not mention or explain the arbitration provision and what that entailed. Also true, none of the Plaintiffs has been

12

a party to a solar energy contract before. But in light of the above, without more, contracting to arbitrate under these circumstances does not rise to the level of procedural unconscionability.[4]

Compare the contract signing process here to that in *Williams v. Aetna Fin. Co.*, wherein the Ohio Supreme Court opined that "all of the attendant facts and circumstances" "clearly would support a finding that the arbitration clause violated principles of equity[.]" 83 Ohio St. 3d 464, 472 (1998). There, Williams, an elderly woman, contracted with a pitchman for interior and exterior home repairs—that is, effectively a salesperson who does not perform the repairs himself, but contracts the work out the others. *Id.* at 465. Over the next few weeks, the pitchman's employees transported Williams to a specific branch of a specific bank in order for Williams to sign for loans for the services and other debts as a result of the pitchman's relationship and status with the branch manager. *Id.* at 465–66. Despite having a $420 or $430 income per month with $190 allocated to other debts, the bank nonetheless set Williams up with a combined $315 monthly payment toward these loans alone and charged her hundreds of dollars in fees up front. *Id.* Williams signed some of the loan checks directly to the pitchman. *Id.* at 466. Yet the workers coordinated by the pitchman completed only a minimal amount of the work contracted for and eventually stopped showing up, and the pitchman refused to respond to Williams about the unsatisfactory performance. *Id.* So, after two payments, Williams ceased payments on the loans and brought suit against the pitchman and the bank, alleging a fraudulent scheme in which the pitchman prayed on unsophisticated, low-income, elderly homeowners to his and the bank's benefit, as both knew the homeowners would acquire loans from this specific bank branch and yet the work would not be completed. *Id.* 466–68. Indeed, witnesses testified that the bank employees were accepting direct payments from the pitchman. *Id.* at 468. The trial court denied the bank's motion to compel based

---

[4] Nor is this Court moved by the cases cited by Plaintiffs, many of which do not appear to support their argument. (*See* ECF No. 130 at 11–12).

13

on language in the loan agreement and, rejecting the idea that the loan agreements and home improvement contracts were "separate transactions," the jury found in favor of Williams. *Id.* at 468–69. After weaving its way through the lower courts, the Ohio Supreme Court affirmed the denial of arbitration based on the infirmity of the contract. *Id.* at 472–73.

Plaintiffs' situation here is not on all fours with Williams.' Instead, this situation falls within "the well-settled principle that a person who is competent to contract and who signs a written document without reading it is bound by its terms and cannot avoid its consequences." *Eng. v. Cornwell Quality Tools Co.*, 2005-Ohio-6983, ¶ 22, 2005 WL 3556281 (9th Dist.). Because the Arbitration Clauses are not procedurally unconscionable, Plaintiffs have failed to meet their burden of demonstrating the unconscionability of the agreement, and so the Arbitration Clauses are enforceable.

### C. Scope of the Arbitration Provision and Non-Arbitrability

Having found that the Arbitration Clauses are valid, this Court considers whether Plaintiffs' claims fall within their scope. As discussed above, while both Arbitration Clauses are broad, the Annon's Arbitration Clause is a bit more tailored, covering "dispute[s] arising out of or relating to the negotiation, award, construction, performance or non-performance, of any aspect of this agreement," (No. 22-cv-2930, ECF No. 129, Ex. A), as opposed to "any claim, dispute, or other matter in question arising out of or related to the agreement, the project, and/or the system[.]" (No. 22-cv-2930, ECF No. 129, Ex. B). That said, all of the causes of actions in the Plaintiffs' Amended Complaints fall within the respective Plaintiffs' Arbitration Clause, as both include agreements to arbitrate since they all relate to the marketing, sale, purchase, and installation of their solar panel system. Additionally, Plaintiffs provided no evidence, such as text or history, that Congress

14

intended any of these claims to be considered "nonarbitrable." *Glazer*, 394 F.3d at 451. Therefore, this Court finds all of Plaintiffs' claims against Pink Energy are subject to arbitration.

### D. Stay Versus Dismissal

Finding that Plaintiffs' claims are subject to arbitration and the Arbitration Provision is not unconscionable, this Court finally determines whether it should dismiss the claims against Pink Energy as requested or enter a stay of the action. When all claims fall under the scope of an arbitration agreement, the court is to direct the parties to proceed to arbitration and dismiss the claims, without prejudice and subject to reinstatement, if necessary, so no further action is required of the court, except to enter judgment. *See Orcutt v. Kettering Radiologists, Inc.*, 199 F. Supp. 2d 746, 757 (S.D. Ohio 2002). Since this Court found all claims against Pink Energy fall under the scope of the Arbitration Clauses, this Court finds it appropriate to dismiss, rather than stay, Plaintiffs' claims against Pink Energy. Accordingly, Pink Energy's Motion to Compel Arbitration and Dismiss is **GRANTED**.

### VI. CONCLUSION

For the foregoing reasons, Pink Energy's Motion to Compel Arbitration and Dismiss is **GRANTED**. As a result, all claims against all Defendants in these cases are **DISMISSED**. Plaintiffs are therefore **ORDERED** to submit their claims against Pink Energy to arbitration according to the terms of the Sales Agreements. These cases are hereby **DISMISSED**.

**IT IS SO ORDERED.**

                                                      _____
                                                      **ALGENON L. MARBLEY**
                                                      **CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: May 21, 2024**